**Dated: July 25, 2018**

**The following is ORDERED:**



Sarah A Hall
United States Bankruptcy Judge

_____

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| In re: | ) |
| | ) |
| THOMAS CHRISTOPHER McDERMOTT | ) Case No. 16-10803-SAH |
| and JENNIE A. McDERMOTT, | ) Chapter 7 |
| | ) |
| Debtors. | ) |
| | ) |
| _____ | ) |
| | ) |
| ADVANCED RESOURCE SOLUTIONS, | ) |
| LLC, an Arizona limited liability company, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. No. 16-01066 |
| | ) |
| THOMAS CHRISTOPHER McDERMOTT | ) |
| and JENNIE A. McDERMOTT, | ) |
| | ) |
| Defendants. | ) |

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

On February 21 and 23, 2018, the Court conducted a trial on the Second Amended

Complaint to Determine Dischargeability Pursuant to 11 U.S.C. §§ 523(a)(2)(4) & (6) [Doc. 17]

(the "Second Amended Complaint") filed on August 30, 2016, by Advanced Resource Solutions,

LLC ("ARS") against debtors Thomas Christopher McDermott and Jennie A. McDermott (collectively "Debtors," individually "Mr. McDermott" or "Mrs. McDermott").[1]  Attorneys Mark B. Toffoli and Ronald R. Tracy appeared on behalf of ARS, and attorney Gary D. Hammond appeared on behalf of Debtors.  As directed by the Court at the conclusion of trial, the parties filed their written closing arguments on March 26, 2018.

## JURISDICTION

The Court has jurisdiction to hear the Second Amended Complaint pursuant to 28 U.S.C. § 1334(b), and venue is proper pursuant to 28 U.S.C. § 1409.  Reference to the Court of this matter is proper pursuant to 28 U.S.C. § 157(a), and this is a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(I).

## BACKGROUND

Debtors previously owned and operated McDermott Electric, LLC ("Electric"), an electrical subcontractor.  ARS is a temporary staffing company that supplies skilled construction trade laborers to contractors and subcontractors.  After Electric submitted an account application to ARS in 2014, the parties entered into a written contract under which ARS agreed to provide contract employees to Electric on an open-account basis.  Mr. McDermott personally guaranteed the contract.  Electric failed to fully pay its invoices for the construction workers supplied, so ARS filed suit in Arizona state court against Electric and Mr. McDermott for breach of contract and fraud.  ARS was granted a default judgment against Electric in that action in January 2016.

---

[1]ARS filed its initial complaint on June 13, 2016 [Doc. 1], and amended it on July 1, 2016 [Doc. 9].  The Court granted Debtors' motion to dismiss [Doc. 13] in part, but granted leave to amend in an order entered on August 11, 2016 [Doc. 15].  ARS then filed its Second Amended Complaint on August 30, 2016 [Doc. 17].

Before ARS could obtain a default judgment against Mr. McDermott, Debtors filed their chapter 7 petition. On their Schedule E/F, Debtors listed a nonpriority, unsecured claim of ARS in the amount of $1,165,613.32 (the "Debt"), which represents the amount of the Arizona default judgment. ARS then initiated this adversary proceeding, seeking to except the Debt from Debtors' discharge pursuant to 11 U.S.C. § 523(a).[2] ARS alleges the Debt is nondischargeable under: (i) Section 523(a)(2)(B) based on a materially false statement of financial condition on Electric's application to establish the open-account relationship; (ii) Section 523(a)(4) because Debtors (via Electric) committed fraud or defalcation in their fiduciary capacity under state law construction trust statutes; and (iii) Section 523(a)(6) because Electric's nonpayment of its invoices constitutes willful and malicious injury to ARS.

In making the following Findings of Fact and Conclusions of Law, the Court considered:

a.      The Final Pretrial Order [Doc. 36] (the "Pretrial Order"), entered on February 9, 2018;

b.      The trial record, including exhibits introduced by Debtors and ARS and admitted by the Court, and the testimony of Mark Osugi a/k/a Mark Davis,[3] owner of ARS, Mr. McDermott, Mrs. McDermott, and David Payne, expert witness for Debtors.

c.      Thomas Christopher McDermott and Jennie A. McDermott's Closing Arguments filed by Debtors on March 26, 2018 [Doc. 49]; and

---

[2]Unless otherwise indicated, hereafter all references to sections are to the Bankruptcy Code, Title 11 of the United States Code.

[3]The Court will refer to Mr. Osugi as Davis in light of the fact that exhibits reflect use of the name Davis.

      d.      Closing Statement of Plaintiff filed by ARS on March 26, 2018 [Doc. 50].

## FINDINGS OF FACT

***The Parties***

1.      Electric, an Oklahoma limited liability company, is an electrical subcontractor and an insider of Debtors.  Stipulated Fact 5.

2.      At all relevant times herein, Debtors were collectively the owners, operators, agents, and/or managers of Electric.  Stipulated Fact 6.

3.      ARS, an Arizona limited liability company, is a temporary staffing company that supplies skilled workers to fulfill construction trade labor needs of general contractors and subcontractors.  ARS screens labor applicants and hires them as its employees.  After withholding taxes, ARS pays its employees on a weekly basis depending on work they performed for its clients.  Davis testimony.

4.      ARS is owned by Davis.  According to Davis, ARS does business and has clients in "30 to 40 different states."  Davis testimony.

***Establishment of the Open-Account Relationship – The Application and Contract***

5.      Electric's solicitation of temporary workers from ARS in January 2014 was initially conducted by Greg Meyers ("Meyers"), a project manager at Electric, with whom Davis and ARS had a prior relationship.  Davis testimony; ARS Exhibit 13.

6.      In December 2013, Mr. McDermott was suffering from crushed back vertebrae. In January 2014, he was in the hospital or a rehabilitation facility recovering from surgery and did not return to work until early March 2014.  During his absence, Kevin King, general manager of Electric ("King"), was in charge of day-to-day operations of Electric.  Mr. McDermott testimony.

7.     An ARS Account Application (the "Application")[4] was signed by Mr. McDermott on January 17, 2014.  According to Mr. McDermott, however, he did not fill out or provide the information contained in the Application.  Mr. McDermott testimony.  Mrs. McDermott was unaware of who prepared the Application, and she did not review or sign it.  Mrs. McDermott testimony.

8.     The Application requested bank references, and the information provided by Electric was an account number for an account at First Fidelity Bank.  The trial testimony was that such account was actually Debtors' personal bank account.  However, Electric maintained only one operating bank account for its entire business, and that account was also with First Fidelity Bank.  ARS Exhibit 14; Mr. McDermott testimony; Mrs. McDermott testimony.

9.     The "Financial Information about your Company" section of the Application asked for information regarding Electric's assets, liabilities, and net income.  The space for "Approximate Annual Net Income," was filled in with $1,750,000.[5]  However, the spaces for "Assets" and  "Liabilities" were left blank.  ARS Exhibit 14.  ARS did not follow-up on the missing information on assets and liabilities.

10.     The Application also asked for three credit references.  Electric gave contact information for two – Consolidated Electric Distributors, Inc. and Locke Supply Company.  ARS Exhibit 14.

---

[4]According to Davis, ARS requires the Application to be completed in full by prospective customers.  Davis testimony.

[5]Davis freely admitted $1,7500,00 in income could not have been generated by the 23 Electric employees identified in the Application.  Davis testimony.

11. ARS contacted First Fidelity, Consolidated Electrical Distributors, Inc. and Locke Supply Co., but only obtained minimal confirmation of the existence of the accounts. Davis testimony; ARS Exhibits

12. ARS did not request financial statements or tax returns from Electric to verify its estimated annual net income on the Application. Davis testimony. Electric's tax return for tax year 2011 showed net income of $39. ARS Exhibit 105. Electric's tax return for tax year 2012 showed a net loss of $265,047. ARS Exhibit 106

13. ARS relied on the Application to some extent in deciding to "extend credit," which in this case was providing workers on an open-account basis to Electric. Davis testimony.

14. In determining to do business with Electric, ARS also relied on the representations of Meyers, who vouched for Electric, indicating it was a viable company having large jobs on which it worked from the ground up, such as facilities for WalMart and Dick's Sporting Goods. Davis testimony.

15. ARS further relied on its belief that customers hiring general contractors vet them, and, in turn, general contractors vet subcontractors. Davis testimony.

16. On January 21, 2014, an ARS Client Contract (the "Contract") was signed by Mr. McDermott as owner of Electric, as well as in his individual capacity as personal guarantor of payment of ARS invoices. ARS Exhibit 14.

17. On January 21, 2014, the "completed paperwork" was electronically transmitted to ARS by King. ARS Exhibit 14.

18. The Contract states "CLIENT understands invoices are due and payable upon receipt of same." ARS Exhibit 14, Contract at ¶ 9. However, ARS and Electric made an

agreement that payment of invoices would instead be due within 60 days of receipt.  ARS

Exhibit 17; Davis testimony.

19.     The Contract also states monthly late charges at the rate of 2 percent per month or

the maximum legal interest rate whichever is higher will be added to the outstanding balance on

all  invoices not paid in full after 90 days.  ARS Exhibit 14.  However, ARS and Electric agreed

that finance charges would apply to invoices outstanding for more than 60 days.  ARS Exhibit

60; Davis testimony.

### Initial Transactions in the Open-Account Relationship

20.     During its relationship with Electric, ARS provided workers on numerous projects

in various states, including North Carolina, Oklahoma, Texas, and Washington.  Stipulated

Fact 11.

21.     ARS initially began supplying workers to Electric at the end of January 2014 on

two jobs – one in Lawton, Oklahoma and one in Edmond, Oklahoma.  ARS' first invoices to

Electric were dated January 29, 2014, and stated a due date of March 30, 2014.  ARS continued

to supply workers on these two jobs through the middle of January 2015, invoicing Electric on a

weekly basis.  ARS Exhibit 60 at pp. 28, 32, 33, 52, 55, 56 & 82.

22.     It appears Electric paid a few of ARS' initial weekly invoices in full and close to

within 60 days of receipt at the end of March 2014 and during April 2014.  But timely payment

was short-lived because, by the time Electric paid its first invoices, it was already in debt to ARS

on the Lawton project in the amount of $93,848.21 and on the Edmond project in the amount of

$27,448.03.  ARS Exhibit 60 at pp. 28, 32, 33, 55 & 56.

7

*Electric's Delinquent Invoices and ARS' Continued Provision of Labor*

23.     On July 7, 2014, after Electric fell increasingly behind in its payment of invoices, ARS began assessing finance charges on amounts outstanding for more than 60 days.  Invoices incurring finance charges were dated as early as March 19, 2014, or about seven weeks into the open-account relationship, and were stated as due May 18, 2014.  ARS Exhibit 60 at pp. 39 & 58.

24.     On July 18, 2014, Davis emailed Electric stating "I will need receivables to be within 60 days."  ARS Exhibit 16.

25.     On July 28, 2014, Davis emailed Electric stating "we will be applying payment to the finance charges first until the balance gets to be within the 60 days aging." ARS Exhibit 15.

26.     On August 7, 2014, Davis emailed Electric stating that the "billing needs to get within the 60 days that we agreed upon at the beginning of our relationship.  Please provide a plan to get to within 60 days of billing.  At 90 days past due, the billable rates will have to increase[.]"  ARS Exhibit 17.

27.     Notwithstanding that Electric was significantly indebted to ARS and not paying its invoices on a timely basis, in July and August 2014, ARS began providing workers to Electric on ***additional*** projects in Washington and North Carolina.  ARS Exhibit 60.

28.     Electric utilized ARS workers on one small job in Moses Lake, Washington, during July and August of 2014.  According to ARS, the invoices for this job were paid in full. ARS Exhibit 60 at pp. 143-145.

29.     Electric utilized ARS workers on one large job in Goldsboro, North Carolina, between August 2014 and June 2015.  Numerous payments made by Electric from November

2014 to June 2015 were credited to this job, and the outstanding invoices on this project total only $11,260.74.  ARS Exhibit 60.

30.     In September 2014, ARS began furnishing workers to Electric on ***numerous new*** projects in Texas.  These included a large unspecified job in Waco, a Panda Express in Bryan, and a small unspecified job in College Station.  According to ARS, the invoices for the Panda Express and College Station jobs were paid in full.  ARS Exhibit 60 at pp. 109, 145 & 154.

31.      By December 24, 2014, Electric had substantial invoices from ARS that had been outstanding for more than 90 days.  ARS emailed Electric and inquired about payments to bring Electric current on its invoices.  Electric responded, stating it planned/hoped to make payments to ARS in January 2015 totaling $360,000.  ARS Exhibit 20.

32.     In January 2015, Electric made payments to ARS totaling only $180,843.34. Debtors Exhibit 59.

33.     According to Davis, as a result of Electric's delinquent invoices, in January 2015, he was forced to increase his own lines of credit and take out business loans in the amount of $600,000, using his home as collateral, to be able to pay his employees who were working on Electric's projects.  Davis testimony.

34.     As of January 28, 2015, Electric had unpaid invoices from ARS that had been outstanding for more than 60 days in the total amount of over $366,000.  ARS Exhibit 24.

35.     During January 2015, ARS began furnishing workers to Electric on ***two new*** Oklahoma projects – Cabela's World's Foremost Outfitter in Oklahoma City/Edmond ("Cabela's") and a WalMart in Luther ("WalMart Luther") – and ***one new Texas project*** – a WalMart in Amarillo.  During February 2015, ARS began furnishing workers to Electric on

9

*another new* Oklahoma project – an Integris Medical Center Office Building in Edmond ("Integris").  ARS Exhibit 60.

36.     According to an email from Davis to Mr. McDermott, as of February 25, 2015, Electric had invoices outstanding more than 60 days in the total amount of $537,145 and, of that, $190,734 was past due more than 90 days.  Although the Aging Detail attached is not consistent with those numbers, it does indicate that as of that date Electric owed ARS $870,802.  ARS Exhibit 29.

37.     As of March 11, 2015, Electric's invoices outstanding more than 60 days totaled over $600,000.  ARS Exhibit 33.

38.     Nevertheless, on March 10 and 11, 2015, ARS began furnishing workers to Electric on *four new* projects in Waco, Texas.  ARS Exhibit 60 at pp. 104, 109, 125 & 139.

***Electric's Payment Plan and Payments to ARS Between January and June 2015***

39.     <u>Via</u> email, ARS constantly requested that Electric come up with a plan to get current on its invoices.  ARS Exhibits 20, 21, 24, 25, 27, 28 and 29.  Although not specifically agreed to by ARS, Electric began a "payment plan" with respect to the outstanding invoices and attempted to pay ARS $50,000 per week.  Davis testimony; Debtors' testimony.

40.     Electric did not always pay ARS $50,000 per week, but between January 2015 and June 2015, Electric paid ARS at least $130,000 per month.  Debtors Exhibits 59 to 64.

41.     Electric did not specify the invoices to be credited with respect to the payments it made to ARS.  Debtors Exhibits 59 to 64; Mrs. McDermott testimony.

***Events Leading up to July 8, 2015, and Electric's Alleged Termination of Business***

42.    In the middle of June 2015, Mr. McDermott was considering taking a loan from Capital Alliance with an effective interest rate of a least 40 percent.  He consulted Davis who advised him that it was a "bad loan" that "will put you in a world of financial hurt" and was "not worth it."  He also stated "If you can't see a way to get through, I will also discontinue the assistance and pursue legal and liens."  Mr. McDermott did not take out the loan and told Davis "you will have to do what is best for you."  ARS Exhibits 49 and 51.

43.    The last payments made by Electric to ARS (other than a check for $76.80 on July 9, 2015) were two checks in the amount of $50,000 dated June 19, 2015.  McDermott testimony; ARS Exhibit 64.

44.    In early July 2015, Davis pulled his employees off Electric's Cabela's job in Oklahoma City because ARS was not getting paid.  Davis testimony.

45.    On July 3, 2015, a check in the amount of $92,183.58 from Crosslands Construction, general contractor on the Cabela's project ("Crosslands"), was deposited into Electric's operating account.  ARS Exhibit 65.

46.    On July 3, 2015, Electric issued a check in the amount of $52,500 to Mrs. McDermott.  On July 7, 2015, $50,000 was transferred/deposited in Electric's account from Debtors' personal account.  ARS Exhibit 65; Mrs. McDermott testimony.

47.    On July 7, 2015, Mrs. McDermott informed Davis by email that she was sending ARS a check for $50,000 <u>via</u> FedEx.  A copy of the check and the FedEx label were attached. The email asked Davis to confirm that he would have manpower back on the Cabela's job by the

next day at the latest and was also sent to personnel of Crossland, the general contractor on the Cabela's project.  ARS Exhibit 57.

48.     ARS supplied workers on the Cabela's job site on July 8, 2015, but never received the $50,000 check because the FedEx delivery was cancelled by Mrs. McDermott.  Davis testimony; Mrs. McDermott testimony.

49.     On July 8, 2015, Electric issued a check in the amount of $50,000 to Mrs. McDermott.  ARS Exhibit 65.

50.     On July 8, 2015, Mrs. McDermott sent ARS an email stating that Electric "has been forced to go out of business . . . effect[ive] at 4:00 p.m. today the 8th of July," and referring any questions to Electric's attorney.  ARS Exhibit 142.

51.     The last invoices from ARS to Electric on the Cabela's and other jobs prior to the incidents of July 7 and 8, 2015, were dated June 24, 2015.  ARS Exhibit 60.

52.     On July 8, 2015, ARS issued two invoices on the Cabela's job, one in the amount of $13,406.30 and one in the amount of $16,258.23.  ARS Exhibit 60.  The invoices do not give details regarding the dates the labor was supplied, and therefore, it appears the invoices could cover dates after June 24, 2015, up to and including July 8, 2015.

53.     When Electric allegedly ceased operations, its unpaid invoices from ARS totaled over $1,000,000.  The projects with outstanding invoices include three in Oklahoma and six in Texas (the details of which are discussed below).  Davis testimony; ARS Exhibit 61.

***Events Following Electric's Alleged Termination on July 8, 2015***

54.     Electric continued to operate to some extent after July 8, 2015, to finish jobs already in progress.  Mrs. McDermott testimony.

55.     ARS filed a Mechanic's and Materialman's Lien Statement pursuant to Okla. Stat. tit. 42, § 143 with respect to the Cabela's project on August 28, 2015.  ARS Exhibits 64, 65, 66 and 67.

56.     ARS filed a Mechanic's and Materialman's Lien Statement pursuant to Okla. Stat. tit. 42, § 143 with respect to the WalMart project on August 15, 2015.  ARS Exhibits 68, 69, 70 and 71.

57.     ARS filed a Mechanic's and Materialman's Lien Statement pursuant to Okla. Stat. tit. 42, § 143 with respect to the Integris project on August 28, 2015.  ARS Exhibits  73, 74 and 757.

58.     Davis was able to collect a few payments from the general contractors on Electric's projects, and any amounts received were credited to Electric's outstanding invoices. Davis testimony.

59.     During the period July 2015 to January 2016, cash and checks totaling $151,870.78 were issued to Debtors from Electric's operating account at Fidelity Bank.  Mrs. McDermott testified that some of the transfers were repayments of loans from Debtors to Electric, and that $22,600 paid in January 2016 was back pay. ARS Exhibits 81 through 87; Mrs. McDermott testimony.

60.     During the period July 2015 to October 2015, transfers or deposits were made to Electric's operating account in the amount of $98,400 from Debtors' personal account.  ARS Exhibit 81, 83, 84; Mrs. McDermott testimony.  Therefore, the amount Debtors received from Electric after its alleged termination of business was $53,470.78 more than Debtors transferred to Electric.

61.    During December 2015, Electric collected and deposited at least one receivable in the amount of $57,080.07 from Wynn Construction on the Insurica job.  ARS Exhibit 86; Mrs. McDermott testimony.  According to ARS Exhibit 61, the total amount invoiced by ARS on this job was $76.80, which was paid by Electric in July 2015.

*Texas Projects With Outstanding Invoices*

62.    The Texas Projects with outstanding invoices include Central Texas Market Place, DSW, Haverty's Furniture, and JoAnn's Fabrics, all in Waco, another large unspecified job in Waco, and a WalMart in Amarillo.  ARS Exhibit 61 at pp. 228, 234, 236, 244, 248 & 256.

63.    ARS did not present any testimony regarding the specific amounts owed on any of the Texas Projects.  Davis did testify, however, that he filed only retention liens on the Texas Projects because Texas construction fund statutes do not require liens to be filed.  Davis testimony.

*Oklahoma Projects with Outstanding Invoices and Payments from General Contractors*

64.    The Oklahoma projects with outstanding invoices are Integris, WalMart Luther, and Cabela's.  ARS Exhibit 60; Davis testimony.  The general contractors on these projects were Robins and Morton, Stava Building Corporation ("Stava"), and Crosslands respectively.  Davis testimony; Debtors' testimony.

65.    ARS first invoiced Electric for workers supplied on the Cabela's job on January 21, 2015.  ARS Exhibit 60.  The total amount ARS invoiced Electric on the Cabela's job was $222,608.43, of which $26,972.04 represents finance charges.  ARS Exhibit 60.

66.     During the period February 2015 to July 2015, Electric's bank statements indicate it received payments from Crosslands on the Cabela's project in the total amount of $681,697.52. Debtors' Exhibits 60 – 65; Mr. McDermott testimony.

67.     ARS first invoiced Electric for workers supplied on the WalMart Luther job on January 28, 2015.  The total amount ARS invoiced on the WalMart Luther job was $115,706.50, of which $5,308.90 represents finance charges.  ARS Exhibit 60.

68.     During the period February 2015 to May 2015, Electric's bank statements indicate it received payments from Stava on the WalMart Luther project in the total amount of $167,291.30.  Debtors Exhibits 60 to 63; Mr. McDermott testimony.

69.     ARS first invoiced Electric for workers supplied on the Integris job in Oklahoma City on February 18, 2015.  The total amount ARS invoiced on the Integris job was $119,032.95, of which $11,550.11 represents finance charges.  ARS collected $105,000.00 from the general contractor Robins and Morton, and therefore, the outstanding balance owed on the Integris project is $14,032.95.  ARS Exhibit 60; Davis testimony.

70.     During the period September 2014 to June 2015, Electric's bank statements indicate it received payments from Robins and Morton on the Integris project in the total amount of $467,456.60.  Debtors Exhibits 55, 57–64; Mr. McDermott testimony.

71.     ARS invoiced Electric on the Cabela's, Integris, and WalMart Luther projects a combined total of $457,347.88, including finance charges for services rendered during the period January 2015 to July 2015.  ARS Exhibit 60.

15

72.     During the period September 2014 to July 2015, the total payments Electric received from the general contractors on the Cabela's, Integris, and WalMart Luther projects was $1,316,445.49.  Debtors Exhibits 55, 57–65; Mr. McDermott testimony.

73.     Electric made no payments to ARS during September 2014.  Debtors Exhibit 55. ARS' invoices indicate that during the month of October 2014, Electric made payments to ARS in the total amount of $193,973.22.  ARS Exhibit 60 at pp. 42, 70, 144 & 145.  During the period November 2014 to July 2015, Electric's bank statements indicate it made payments to ARS in the total amount of $1,267,543.64.  Therefore, for the period September 2014 to July 2015 (the period during which general contractor payments were received), Electric made payments to ARS in the total amount of $1,461,516.86.  Debtors Exhibits 55, 57–65; Mr. McDermott testimony.

74.     None of the payments Electric made to ARS during the period September 2014 to July 2015 were ever credited to the Cabela's, Integris, or WalMart Luther projects.  ARS Exhibits 60 and 61.  According to Davis, payments made by Electric during this time period were applied to earlier invoices on other projects.  Davis testimony.

75.     The information above regarding the unpaid Oklahoma jobs is summarized in the table below.

| OKLAHOMA JOBS WITH OUTSTANDING INVOICES | | | | |
|---|---|---|---|---|
| | **Integris** | **Cabela's** | **WalMart Luther** | **Total** |
| Total billed by ARS to Electric* | $119,032.95 | $222,608.43 | $115,706.50 | $  457,347.88 |
| Total collected by Electric from 3 GCs** | $467,456.60 | $681,697.52 | $167,291.30 | $1,316,445.49 |
| Total payments made by Electric to ARS*** | -0- credited | -0- credited | -0- credited | $1,461,516.86 |

\*        amount is total billed on particular job including finance charges
\*\*       Robins & Morton, Crosslands, and Stava
\*\*\*      payments made during period September 2014 to July 2015

### ARS Default Judgment Against Electric

76.     In 2015, ARS filed suit against Electric and Mr. McDermott in Arizona state court and obtained a default judgment ("Default Judgment") against Electric on January 10, 2016. Stipulated Fact 9; ARS Exhibit 4.

77.     The 2016 Default Judgment found, inter alia, that ARS have judgment as follows:

    a.      For unpaid invoices of $1,054,163.43;

    b.      For pre-judgment interest of $124,600.40;

    c.      For chargeable costs of $453.50; and

    d.      For attorney's fees of $11,550.00,

for a total judgment of $1,165,613.32, plus post-judgment interest at the rate of 4.5 percent per annum from the date of judgment until paid.  Stipulated Fact 10.

17

***Bankruptcy Proceedings***

76.    Debtors filed their voluntary chapter 7 petition for relief on March 9, 2016. Stipulated Fact 1.

77.    ARS initiated this adversary proceeding on June 13, 2016.  Stipulated Fact 2. Although an ARS Statement dated December 2, 2016, shows a balance due and owing by Electric in the amount of $1,058,763.88, which represents unpaid invoices together with finance charges thereon, the damages in the Default Judgment for outstanding invoices is slightly lower and is the amount at issue in this proceeding.

***Credibility of the Witnesses***

78.    The Court found Davis, Mr. McDermott, and Mrs. McDermott to be generally credible witnesses, with all three, as would be expected, giving their own self-serving version of events.

79.    The Court found Mr. Payne to be a credible expert witness, but notes that, given the particular facts of this case, his expert report and testimony were not particularly helpful or necessary.

## CONCLUSIONS OF LAW

The Bankruptcy Code's fresh start policy "limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.'" Grogan v. Garner, 498 U.S. 279, 286-87 (1991) (citing Local Loan Co. v. Hunt, 292 U.S. 234, 244 (1934)).  The Bankruptcy Code's nondischargeability provisions reflect Congress' decision to exclude certain categories of debts from discharge.  Grogan, 498 U.S. at 287.  Many of the provisions in Section 523(a) aim to prevent discharge of debts involving a debtor's dishonesty or fraud.  However,

18

exceptions to discharge must be narrowly construed with doubt being resolved in the debtor's favor. <u>Bellco First Federal Credit Union v. Kaspar</u> (<u>In re Kaspar</u>), 125 F.3d 1358, 1361 (10th Cir. 1997). Moreover, it is the creditor seeking to except a debt from discharge that has the burden of proving each element of its claim by a preponderance of the evidence. <u>Grogan</u>, 498 U.S. at 286.

In this case, ARS seeks to except its Debt, the Default Judgment, from Debtors' discharge under three different theories. First, ARS argues that the Application Electric submitted to ARS was a materially false statement of financial condition, which renders its Debt nondischargeable under Section 523(a)(2)(B). Second, ARS contends that Electric committed fraud or defalcation in its fiduciary capacity under state law construction trust fund statutes, which renders its Debt nondischargeable under Section 523(a)(4). And third, ARS asserts that Electric's nonpayment of its invoices constitutes willful and malicious injury to ARS, which renders its Debt nondischargable under Section 523(a)(6).

As discussed below, the Court concludes that ARS is not entitled to a determination of nondischargeability of its Debt under any of the three enumerated theories.

## I.    SECTION 523(A)(2)(B) DOES NOT PREVENT DISCHARGE OF DEBTORS' DEBT TO ARS.

In order for a debt to be excepted from discharge pursuant to Section 523(a)(2)(B), the plaintiff must prove the following four elements: (i) the debt was incurred using a written statement that is materially false; (ii) the written statement was one respecting the debtor's financial condition (or insiders); (iii) the debtor caused the written statement to be published with intent to deceive; and (iv) the creditor reasonably relied on the written statement. <u>Salim Inv., Ltd. v. Benton</u> (<u>In re CSI Enter., Ltd.</u>), 203 F.3d 834 (Table) 2009 WL 93989, *2 (10th Cir. 2000).

To constitute a "written statement" for purposes of Section 523(a)(2)(B), the statement must either have been written by the debtor, signed by the debtor, or written by someone else but adopted and used by the debtor. Kaspar, 125 F.3d at 1361 (citing 4 Collier on Bankruptcy ¶ 523.08[2][a]).

The United States Supreme Court recently opined that "use of the word 'respecting' in a legal context generally has a broadening effect," and thus the phrase "respecting the debtor's or an insider's financial condition" includes any statement that has "a direct relation to or impact on the debtor's overall financial status." Lamar, Archer & Cofrin, LLP v. Appling, 138 S.Ct. 1752, 1760-61, 2018 WL 2465174, *6-7 (U.S. Sup. Ct. June 4, 2018). A statement about a debtor's annual net income is, therefore, a statement falling within Section 523(a)(2)(B)(ii). A materially false statement is one that portrays a substantially untruthful picture of financial condition and "would normally affect the decision to grant credit." Privitera v. Curran (In re Curran), 855 F.3d 19, 25 (1st Cir. 2017) (quoting Bethpage Fed. Credit Union v. Furio (In re Furio), 77 F.3d 622, 625 (2d Cir. 1996)).

The Court finds that ARS has established the first two elements of its Section 523(a)(2)(B) claim, i.e. the making of a materially false written statement respecting Electric's financial condition, against Mr. McDermott. Although he did not prepare the Application, the parties do not dispute that it constitutes a written statement regarding the financial condition of Electric because it states approximate annual net income. See Kaspar, 125 F.3d at 1361 (representation regarding income need not be formal financial statement as long as it constitutes information about the debtor's or insider's overall income flow). Further, the Application was signed by Mr. McDermott and permitted by him to be published to ARS. Nor is there any

dispute that as its owner and managing member, Mr. McDermott and Electric had an insider relationship, and the parties stipulated to such fact. See Finding of Fact ¶ 1 above. See also Section 101(31) and In re Longview Aluminum, L.L.C., 657 F.3d 507, 510 (7th Cir. 2011) (LLC of which debtor is a managing member is analogous to corporation of which the debtor is a director, officer, or person in control).

There is also no dispute that the $1,750,000 figure stated on the Application as Electric's approximate annual net income, a statement respecting its financial condition, was exceedingly false. In reality, the two most recent available tax returns showed Electric had negligible income for tax year 2011 of $39 and a net operating loss of $265,047 for tax year 2012.[6]

On the other hand, Mrs. McDermott testified that she did not prepare, sign, or have any knowledge regarding the Application, and ARS did not produce any evidence to suggest otherwise. Therefore, ARS' claim of nondischargeability of the Debt under Section 523(a)(2)(B) pertains only to Mr. McDermott, and not Mrs. McDermott, because acts and omissions of one spouse may not be imputed to another spouse by virtue of their marital status absent an agency or control relationship. See Bromberg v. Gregory (In re Gregory), 2013 WL 4516657 (Bankr. D. Colo. 2013); MV Indus., Inc. v. Hernandez (In re Hernandez), 2011 WL 3879496 (Bankr. D.N.M. 2011); Kent Enter., Inc. v. Maurer (In re Maurer), 2004 WL 758178 (Bankr. C.D. Ill. 2004); Chevy Chase F.S.B. v. Hable (In re Hable), 107 B.R. 356, 359 (Bankr. M.D. Fla. 1989).

---

[6]The Court notes that the approximate annual net income figure stated in the Application was close to Electric's gross receipts for tax year 2012, which were $1,634,732. But, this similarity was not discussed during trial testimony, and further, there was no explanation as to how the net income figure was derived.

21

The Court concludes that ARS has established the first two elements of a Section 523(a)(2)(B) against Mr. McDermott with respect to the Application.[7]  However, its failure to establish the second two elements, i.e. its reasonable reliance on the Application and Mr. McDermott's intent to deceive, prevent a determination of nondischargeabilty in favor of ARS.

A.    **Even if ARS' Initial Reliance on the Application Was Reasonable, Under the Circumstances**, ARS Could Not Continue to Reasonably Rely on the Application.

To establish a prima facie case under Section 523(a)(2)(B), ARS must also show that it actually relied on the Application and, moreover, that its reliance was reasonable.  First Nat'l Bank v. Cribbs (In re Cribbs), 2006 WL 1875366, *2 (10th Cir. July 7, 2006) (unpub.) (citing Field v. Mans, 516 U.S. 59, 68 (1995)).  Davis testified that he, in fact, relied on the Application in deciding whether to enter the open-account relationship with Electric.  His testimony revealed that he also relied on the assurances of Meyers, Electric's project manager, with whom he had a prior relationship, and that he believed the general contractors would have vetted Electric before hiring it for their projects.  However, ARS is not required to show that it relied exclusively upon Mr. McDermott's false written statement regarding Electric's financial condition in the Application, as per the Tenth Circuit, "[p]artial reliance is enough."  Cribbs, 2006 WL 1875366 at *3 (quoting Central Nat'l Bank & Trust Co. v. Liming (In re Liming), 797 F.2d 895, 897-98

---

[7]The Court is aware, via Davis' testimony, that ARS also relied on statements, both verbal and in emails, that Electric "had jobs and would get ARS paid eventually."  However, even under the Supreme Court's very recent broad interpretation of the phrase "respecting the debtor's or an insider's financial condition,"  Electric's overly broad representations regarding the existence of jobs and its intent to pay ARS would not give rise to a claim under Section 523(a)(2)(B).  Therefore, to the extent that ARS believed the Debt to be nondischargeable on the basis of such general misrepresentations, it was required to, but did not, plead a claim under Section 523(a)(2)(A).

(10th Cir. 1986) (internal citation omitted)).  Thus, "a debt is obtained by fraud if the fraud is a substantial factor in the creditor's decision."  Cribbs, 2006 WL 1875366 at *3 (quoting John Deere Co. v. Gerlach (In re Gerlach), 897 F.2d 1048, 1052 (10th Cir. 1990) (internal quotation omitted)).  The Court concludes that, amongst other things, ARS did, in fact, substantially rely on the Application.

But, ARS' actual reliance on the Application must also have been reasonable.  Courts evaluate the reasonableness of any claimed reliance "according to the particular facts and circumstances present in a given case."  Cribbs, 2006 WL 1875366 at *4 (quoting First Bank of Colo. Springs v. Mullet (In re Mullet), 817 F.2d 677, 679 (10th Cir. 1987), abrogated on other grounds by Field, 516 U.S. at 74-75))  Courts consider the following factors to be relevant to the reasonableness inquiry:  (i) the creditor's standard lending practices; (ii) industry standards; and (iii) "the surrounding circumstances at the time the debtor applies for credit, including whether there are any 'red flags' in the application, whether there was an ongoing business relationship, and whether further investigation would have revealed inaccuracies in the debtor's application."  Cribbs, 2006 WL 1875366 at *4 (citing Insurance Co. of N. Am. v. Cohn (In re Cohn), 54 F.3d 1108, 1117 (3[d] Cir. 1995); Mullet, 817 F.2d at 681)).

Per Davis, it was standard practice for ARS to rely on the Application.[8]  However, red flags[9] abounded with Electric's Application.  First, Electric left parts of the Application blank.  Specifically, the information requested about Electric's assets and liabilities was not provided, and only two of three requested credit references were given.  Additionally, although ARS confirmed that Electric had accounts with its two credit references and an account at the bank listed under bank references, ARS did not conduct any further investigation that would actually reflect on the creditworthiness of Electric.  Nor did ARS ask Electric for financial statements or tax returns to determine assets and liabilities and verify the reported approximate annual net income figure.  These facts raise red flags regarding the reasonableness of ARS' reliance on the incomplete credit Application of an otherwise "unknown" new customer and is indicative of underlying problems in ARS' credit decisions not only at the inception of, but also throughout, its relationship with Electric.

---

[8]There was no evidence regarding the industry standard for materials relied upon prior to entering into an open-account credit relationship with a new customer.  Mr. Payne testified that it was "pretty ordinary" for a creditor to rely on an account application in such a situation but that other documents, such as financial statements and tax returns, are often requested and analyzed in making the credit decision.  The Court did not find this testimony particularly helpful as it was not industry driven or based.  In the absence of industry standards evidence, the Court cannot find that ARS' blind acceptance of the incomplete credit Application falls within the generally accepted standards in the construction industry.  Bank of Commerce v. Smith (In re Smith), 278 B.R. 532, 538 (Bankr. N.D. Okla. 2002).

[9]The existence of red flags which would put a reasonable person on notice that information in a financial statement may not be accurate is a key factor in determining reasonable reliance; a creditor cannot ignore red flags without undertaking minimal investigation into the questionable representations.  Hurston v. Anzo (In re Anzo), 562 .R. 819, 830 (Bankr. N.D. Ala. 2016) (citing Barley v. Turner (In re Turner), 358 B.R. 422, 427 (Bankr. N.D. Okla. 2006) and Bank of Commerce v. Smith (In re Smith), 278 B.R. 536, 539 (Bankr. N.D. Okla. 2002)).

But here, the Court need not decide whether these facts independently prevent ARS from establishing its prima facie case because the history of the open-account relationship between the parties changes the analysis.  In other words, even if ARS reasonably relied on the Application to establish the open-account relationship with Electric (which the Court finds it did not), ARS could not reasonably continue to rely on the Application in light of the business dealings between the parties over the 18 months that followed.

As set forth in the findings of fact above, ARS first provided workers and invoiced Electric in late January 2014, about a week after the Contract was signed.  The first two projects on which ARS supplied labor were in Lawton and Edmond.  The first invoices for these projects were due March 30, 2014, and were paid in full around that time.  But, thereafter, Electric *quickly fell* behind in its payment of ARS invoices and *was never again current*.  Invoices that were issued on March 19, 2014, and due May 18, 2014, remained outstanding as of July 2014.  Therefore, ARS began assessing finance charges and applying payments received from Electric to finance charges first.

Even assuming ARS reasonably relied on the Application to establish the open-account relationship with Electric, it could not continue to do so in light of the fact that Electric was never current on its payments after May 18, 2014.  Though the dollar amount of Electric's outstanding invoices continued to increase significantly, ARS, nevertheless, proceeded to supply workers to Electric on current *and new* jobs.  In making a decision whether to continue or renew a relationship with a debtor, a creditor is not entitled to simply rely on a stale statement of financial condition without inquiring as to whether the statement actually reflects the debtor's current financial situation.  To do so does not constitute reasonable reliance.  See Security Seed

25

and Chem., Inc. v. French (In re French), 563 B.R. 212, 224 (Bankr. W.D. Ky. 2016) (relying

upon a loan application that, at best, should be considered stale, would not be reasonable);

First Sanlando Bank, N.A. v. Benore (In re Benore), 108 B.R. 797, 799 (Bankr. M.D. Fla. 1989)

(reliance on stale financial statements without inquiry as to whether statements actually reflect

debtor's current financial situation is not reasonable).  From and after January 2014, ARS gained

critical knowledge about, and experience with, Electric that superseded the false information

supplied on the Application, yet continued to extend credit in the form of the open-account

relationship.

The Court recognizes that ARS was, to some extent, in a "catch-22 situation."  In order

for ARS to get paid, Electric needed to be paid on its jobs by the general contractors, which in

return required that Electric have the labor ARS supplied in order to complete the work.  But this

is not a situation that involved one single job.  The Court understands that it may have been

reasonable for ARS to continue providing labor on the initial two jobs it staffed for Electric in

Lawton and Edmond if ARS believed it could not get paid otherwise.  However, ARS continually

supplied workers for *new* Electric projects time after time even when Electric was clearly

over-extended and considerably behind on its payments more than 90 days.

For example, in July and August 2014, Davis was repeatedly emailing Electric that it

needed to bring its invoices current or within 60 days of issuance.  Further, Davis was adding

finance charges to Electric's overdue invoices, and when he received payments, those were

applied to finance charges first.  Findings of Fact ¶¶ 23-26.  Notwithstanding Electric's

significant delinquency in July and August 2014, during that same time period, ARS began

supplying labor for Electric's *new* jobs in Washington and North Carolina.  Findings of Fact

¶¶ 27-29.  One month later, in September 2014, ARS began supplying labor to Electric on at least *three new* projects in Texas.  Findings of Fact ¶ 30.   Moreover, Davis testified that, as a result of Electric's delinquent invoices, in January 2015, he was forced to take out business loans using his home as collateral.  Nevertheless, at the very same time, ARS began supplying Electric with labor for *multiple new* large-scale jobs:  Cabela's, WalMart Luther, and a WalMart in Amarillo.  Findings of Fact ¶¶ 33-35.  Unpaid invoices with respect to these three large jobs are part of the Debt ARS now seeks to have determined nondischargeable under Section 523(a)(2)(B).

Even if ARS reasonably relied on the Application containing a materially false statement of financial condition to establish the open-account relationship with Electric (which it did not), the Court concludes ARS was not entitled to continue relying on the Application for the duration of the relationship. ARS had sufficient knowledge and experience with Electric to know that it was not on a good business footing and was unable to pay its invoices timely, but knowingly chose to take a risk in continuing to supply labor to Electric on *new* projects.  Section 523(a)(2)(B) is not intended to protect a creditor who may initially extend credit based on a false financial statement, but after subsequently learning the reality of the situation, renews or continues to extend such credit.

### B.    ARS Failed to Prove Mr. McDermott's Intent to Deceive With Respect to the Application.

The Bankruptcy Code bars discharge under Section 523(a)(2)(B) only if the debtor published the false written statement respecting financial condition with the intent to deceive. The misrepresentation need not be made with an actual intent to deceive in order to satisfy Section 523(a)(2)(B)'s scienter requirement; instead "reckless disregard for the truth" is

sufficient to make the underlying debt nondischargeable.  Central Nat'l Bank & Trust Co. of

Enid, Okla. v. Liming (In re Liming), 797 F.2d 895, 897 (10th Cir. 1986) (citing Carini v. Matera,

592 F.2d 378, 380-81 (7th Cir. 1979); Houtman v. Mann (In re Houtman), 568 F.2d 651, 655-56

(9th Cir. 1978); 3 L. King, Collier on Bankruptcy ¶ 523.09[5][b], at 523-61 (15th ed. 1981)).

      Mr. McDermott testified that he was in the hospital recovering from back surgery when

the Application was completed for his signature by someone else, presumably King, who at the

time was in charge of day-to-day operations.  Mr. McDermott also testified he had no intent to

deceive anyone.  In considering whether ARS' showing that Mr. McDermott displayed at least a

reckless disregard for the truth has been properly contested, this Court notes that "unsupported

assertions of an honest intent will not overcome the natural inferences from admitted facts."

Liming, 797 F.2d at 897 (quoting 3 Collier ¶ 523.09[5][b], at 523-62; see also In re Moran,

456 F.2d 1030, 1030-31 (3d Cir. 1972), cert. denied, 409 U.S. 872 (1972); In re Monsch,

18 F.Supp. 913, 915 (E.D. Ky. 1937)).  However, "[c]arelessness in making a statement that

turns out to be untrue constitutes negligence, and a negligent misrepresentation is not necessarily

fraudulent."  DSC Nat'l Prop., LLC v. Johnson (In re Johnson), 477 B.R. 156, 170 (10th Cir. BAP

2012).  "[T]he fact that a reasonable person exercising ordinary prudence *should have known* that

the statement was not true does not, by itself, establish an intent to deceive."  Johnson, 477 B.R.

at 170.

      Given the facts here, a determination regarding intent is a difficult one.  Mr. McDermott

testified he did not recall reviewing the Application prior to signing it, but that he, of course,

knew Electric never had net annual income of $1,750,000.  The question becomes whether

signing the Application without reviewing it was careless or whether it constituted a reckless

disregard for the truth.  Because Mr. McDermott relied on another to prepare the Application and was in the hospital recovering from back surgery at the time he signed it, the Court is not inclined to conclude Mr. McDermott had the requisite intent to deceive.  Moreover, even if the Court believed Mr. McDermott's actions rose to the level of reckless disregard for the truth, it has already determined that ARS was not entitled to rely on the Application for the duration of the parties' dealings.

As a result, ARS has not met its burden of establishing the elements of its Section 523(a)(2)(B) claim by a preponderance of the evidence, and Electric's Debt is not barred from discharge thereunder.

## II.    SECTION 523(A)(4) DOES NOT PREVENT DISCHARGE OF DEBTORS' DEBT TO ARS.

Pursuant to Section 523(a)(4), a debtor's discharge does not apply to debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  To state a claim under Section 523(a)(4) for fraud while acting in a fiduciary capacity, "a plaintiff must allege that:  (1) a fiduciary relationship existed between the debtor and the creditor, and (2) the debt owed to the creditor is attributable to a fraud or defalcation committed by the debtor in the course of the fiduciary relationship."  Barenberg v. Burton (In re Burton), 2010 WL 3422584, *5 (10th Cir. BAP 2010).   Federal law determines the existence of a fiduciary relationship for purposes of Section 523(a)(4); however, state law is also relevant to the inquiry.  Fowler Bros. v. Young (In re Young), 91 F.3d 1367, 1371 (10th Cir. 1996).  In the Tenth Circuit, an express or technical trust is required for a fiduciary relationship, and neither a general fiduciary duty of confidence, trust, loyalty, and good faith, nor an inequality between the parties, will give rise to a claim under

Section 523(a)(4).  Fowler Bros., 91 F.3d at 1371-72.  The trust creating the fiduciary capacity must have been expressly established or imposed prior to the alleged tortious action that created the debt.  Fowler Bros., 91 F.3d at 1372.

For purposes of Section 523(a)(4), the United States Supreme Court has ruled that a "defalcation" is an intentionally wrongful or reckless failure to account for funds entrusted to a fiduciary.  Bullock v. BankChampaign, N.A., 133 S.Ct. 1754, 1759 (2013).  Reckless failure to account occurs when a "fiduciary 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty."  Bullock, 133 S.Ct. at 1759.  That risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."  Bullock, 133 S.Ct. at 1760.

A.     **Oklahoma and Texas Construction Trust Fund Statutes Create the Necessary Fiduciary Relationship for Purposes of Nondischargeability Under Section 523(a)(4).**

In order to protect subcontractors and suppliers performing work under a building or remodeling contract between an owner of real property and a general contractor, Oklahoma's lien statutes create "construction trusts" for funds paid under that contract.  Stevens v. Harris (In re Harris), 49 P.3d 710, 716 (Okla. 2002).  Pursuant to the statutes, trust funds may not be used for other purposes until all valid lienable claims have been paid.  See Okla. Stat. Ann. tit. 42,  §§ 152[10] and 153.[11]  Oklahoma law is clear that the statutory duty imposed on a general

_____

[10]Section 152(1) provides as follows:

(continued...)

contractor to hold funds in trust for the payment of subcontractors creates a fiduciary relationship

between the owner and the contractor.  Murphy Oil USA, Inc. v. Wood, 438 F.3d 1008, 1017

(10th Cir. 2006) (citing Okla. Stat. tit. 42, §§ 152, 153; In re Harris, 49 P.3d at 716)).  However,

the fiduciary duty exists only to the extent of lienable claims.  Murphy Oil, 438 F.3d at 1017

(citing In re Harris, 49 P.3d at 716).

As under Oklahoma law, the Texas Property Code contains construction trust fund

statutes that protect subcontractors and ensure they are paid for performing work that constitutes

improvement of real property.  See Tex. Prop. Code Sections 162.001,[12] 162.002,[13] and

---

[10](...continued)
The amount payable under any building or remodeling contract shall, upon receipt by any contractor or subcontractor, be held as trust funds for the payment of all lienable claims due and owing or to become due and owing by such contractors or subcontractors by reason of such building or remodeling contract.

[11]Section 153(1) provides as follows:

The trust funds created under Section 152 of this title shall be applied to the payment of said valid lienable claims and no portion thereof shall be used for any other purpose until all lienable claims due and owing or to become due and owing shall have been paid.

[12]Section 162.001(a) provides as follows:

Construction payments are trust funds under this chapter if the payments are made to a contractor or subcontractor or to an officer, director, or agent of a contractor or subcontractor, under a construction contract for the improvement of specific real property in this state.

[13]Section 162.002 provides as follows:

A contractor, subcontractor, or owner or an officer, director, or agent of a contractor, subcontractor, or owner, who receives trust funds or who has control or direction of trust funds, is a trustee of the trust funds.

31

162.003.[14]  These statutes also create a relevant fiduciary capacity for purposes of Section

523(a)(4).  In re Pledger, 592 F. App'x 296, 299 (5th Cir. 2015) (citing In re Nicholas, 956 F.2d

110, 114 (5th Cir. 1992)).

Therefore, the first required element of ARS' Section 523(a)(4) claim against Debtors has

been met, but ARS must also prove a "defalcation" on Debtors part in order for its Debt to be

nondischargeable.

### B.    Debtors Did Not Commit Fraud or Defalcation in the Course of the Fiduciary Relationship Under Section 523(a)(4).

#### 1.    Texas Projects

Sections 162.001, 162.002, and 162.003 of the Texas Property Code referenced above

create the necessary fiduciary relationship for purposes of Section 523(a)(4).  Section 162.005 of

the Texas Property Code defines a trustee's intent to defraud, providing:

> (1) A trustee acts with "intent to defraud" when the trustee:
>
>> (A) retains, uses, disburses, or diverts trust funds with the intent to deprive the beneficiaries of the trust funds;
>>
>> (B) retains, uses, disburses, or diverts trust funds and fails to establish or maintain a construction account as required by Section 162.006 or fails to establish or maintain an account record for the construction account as required by Section 162.007; or

---

[14]Section 162.003 provides as follows:

An artisan, laborer, mechanic, contractor, subcontractor, or materialman who labors or who furnishes labor or material for the construction or repair of an improvement on specific real property in this state is a beneficiary of any trust funds paid or received in connection with the improvement.

> (C) uses, disburses, or diverts trust funds that were paid to the
> trustee in reliance on an affidavit furnished by the trustee under
> Section 53.085 if the affidavit contains false information relating to
> the trustee's payment of current or past due obligations.

Section 162.031 of the Property Code further defines misapplication of funds and provides an

affirmative defense:

> (a) A trustee who, intentionally or knowingly or with intent to
> defraud, directly or indirectly retains, uses, disburses, or otherwise
> diverts trust funds without first fully paying all current or past due
> obligations incurred by the trustee to the beneficiaries of the trust
> funds, has misapplied the trust funds.

> (b) **It is an affirmative defense to prosecution or other action
> brought under Subsection (a) that the trust funds not paid to
> the beneficiaries of the trust were used by the trustee to pay the
> trustee's actual expenses directly related to the construction or
> repair of the improvement** or have been retained by the trustee,
> after notice to the beneficiary who has made a request for payment,
> as a result of the trustee's reasonable belief that the beneficiary is
> not entitled to such funds or have been retained as authorized or
> required by Chapter 53.

> (d) **A trustee who commingles trust funds with other funds in
> the trustee's possession does not defeat a trust created by this
> chapter**.

For purposes of this proceeding, two important concepts in the Texas statute are highlighted

above.  First, commingling of trust funds does not defeat a trust.  Second, trust funds may be

used to pay a trustee's actual expenses directly related to the construction or repair of the

improvement.

Although the term "trustee's actual expenses" under the statute's affirmative defense

would appear somewhat narrow, the Fifth Circuit Court of Appeals has held that this term is

actually open-ended and quite broad.  In <u>Pledger</u>, the Fifth Circuit explained that it had

previously held "that paying for one project with the funds of another project to keep the business going fell within 'actual expenses directly related to a project' and was not a misapplication of funds under the Trust Fund."  Pledger, 592 F. App'x at 301 (citing In re Nicholas, 956 F.2d 110, 113 (5th Cir. 1992)).  Based in part on its previous decision in Swor v. Bartley Texas Builders Hardware, Inc. (In re Swor), 347 F. App'x 113 (5th Cir. 2009), the Fifth Circuit then concluded that "[i]f spending money on a project can be actual expenses directly related to an entirely separate project, then spending on general overhead for a single project surely qualifies as actual expenses directly related to that project." Pledger, 592 F. App'x at 301.  In In re Monaco, the Fifth Circuit reaffirmed this holding, stating "'general contractors may use the payments they receive from construction projects to keep those projects going even if, in some instances, the beneficiaries are not paid first' . . . includ[ing] payment of 'expenses such as telephone bills, salaries, and other overhead.'"  In re Monaco, 839 F.3d 413, 417 (5th Circuit 2016) (quoting Pledger, 592 F.App'x at 302; Nicholas, 956 F.2d at 113).  On the other hand, withdrawing capital from a business is not a permissible use of trust funds.  Swor, 347 F. App'x at 116.

At trial, ARS had the burden of proving misapplication of funds under the Texas construction fund trust statutes.  Monaco, 839 F.3d at 418.  Based on the Texas case law discussed above, ARS was required to prove that payments Electric received from the general contractors on the unpaid Texas Projects were used or diverted for purposes other than Electric projects or expenses related to Electric's general business overhead.  ARS did not meet its burden of proof in this respect.

ARS introduced no specific evidence regarding the outstanding invoices on the Texas Projects or any of the payments Electric received from the Texas general contractors.  Based on

34

an email from Mr. McDermott to King dated January 1, 2015 (Debtors Exhibit 163), ARS alleged Debtors diverted Electric's funds that should have been used to pay its invoices to themselves to purchase investment land worth more than $100,000 in Yukon, Oklahoma, and $50,0000 toward the purchase of their new house.  However, Mr. McDermott testified that the land in Yukon was purchased by a separate entity, McDermott Property Holdings (ownership of such entity was disclosed on Schedule B of Debtors' Petition).  He further testified that the $50,000 for purchase of the new house was a return of amounts loaned to Electric by Debtors from their retirement accounts.  Although the email suggests that the funds were to be pulled from the operating account and/or an ARS payment, Mr. McDermott testified that ultimately the source of funds for the new house was a revolving line of credit from Cornerstone Bank (two debts to Cornerstone Bank were listed on Schedule E/F of Debtors' Petition).[15]  Although ARS had Electric's bank records, it did not point to any specific transfers to support the allegations of misapplication of funds it made based on the email between Mr. McDermott and King.

ARS did, however, put on evidence to substantiate that after Electric allegedly ceased operations on July 8, 2015, cash and checks totaling $151,870.78 were issued to Debtors from Electric's operating account at Fidelity Bank during the period July 2015 to January 2016.  But, Debtors then put on evidence that during the period July 2015 to October 2015, transfers or deposits from Debtors' personal account were made to Electric's operating account in the amount of $98,400.  So on balance, Debtors withdrew $53,470.78 more from Electric than they

---

[15]A bankruptcy court may take judicial notice of documents or records filed with it, especially in the same case.  See In re Calder, 907 F.2d 953, 954 (10th Cir. 1990); St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp., 605 F.2d 1169, 1172 (10th Cir. 1979); Randy's Studebaker Sales, Inc. v. Nissan Motor Corp., 533 F.2d 510 (10th Cir. 1976).

transferred to Electric during the relevant time period.  But Mrs. McDermott testified that some of the transfers were repayments of loans made by Debtors to Electric, and that $22,600 paid in January 2016 was back pay owed to Debtors.

The only payment/receivable from a general contractor that ARS pointed out during this time period was from Wynn Construction.  A $57,080.07 deposit related to the Insurica project in Oklahoma City was made to Electric's account in December 2015.  ARS' Exhibit 60 showed one small invoice to Electric on this project, which had been paid in full.  Therefore, ARS was not a beneficiary of those particular trust funds received from Wynn Construction.

The United States Supreme Court has ruled that for purposes of Section 523(a)(4), a "defalcation" is an intentionally wrongful or reckless failure to account for funds entrusted to a fiduciary.  Bullock, 133 S.Ct. at 1759.  ARS failed to prove that funds paid to Electric by general contractors on any of the Texas Projects were in fact wrongfully or recklessly diverted by Debtors for non-Electric purposes.  Thus, the Court concludes that Electric's outstanding invoices to ARS with respect to its Texas Projects constitute a dischargeable debt.

## 2.    Oklahoma Projects

Only lienable claims may be recovered under the Oklahoma construction trust fund statute.  ARS filed liens with respect to the three Oklahoma projects with outstanding invoices – Integris, Cabela's and WalMart Luther (the "Oklahoma Projects").  Findings of Fact ¶¶ 68-70.[16]

---

[16]Debtors suggested that the lien filed by ARS on the Cabela's job was not valid based on a ruling in an Oklahoma state court case pending in Lincoln County styled NAICO v. McDermott Elec., LLC, et al., Case No. CJ-2015-140.  See Final Pretrial Order [Doc. 36], filed on February 9, 2018, at p. 11.  However, the validity of the lien was not sufficiently contested at trial as the order itself was not introduced into evidence.  In any event, in light of the Court's conclusion here, the validity of such lien is no longer a relevant fact.

Although ARS may have lienable claims, the Court concludes that it has not met its burden of proving that Debtors violated their fiduciary duties under the Oklahoma statute for purposes of nondischargeability under Section 523(a)(4).

As detailed in the chart set out in the facts above (Findings of Fact ¶ 75), the total amount billed by ARS to Electric on the Oklahoma Projects was $457,347.88. The total amount Electric collected from the general contractors on the Oklahoma Projects during the period September 2014 to July 2015 was $1,316,445.49. The total payments made by Electric to ARS during this same time period was $1,461,516.86. As a result, ARS received $145,071.37 more than the total amount collected by Electric from the three general contractors on the Oklahoma Projects during the time ARS was supplying labor on those Oklahoma Projects. However, none of Electric's payments were ever credited to those particular invoices because ARS credited all payments to the oldest invoices first, including finance charges.

ARS did not introduce any specific evidence to prove that the money Electric received from the general contractors on the Oklahoma Projects was diverted to any inappropriate use. As discussed above in the context of the Texas Projects, ARS primarily bases its Section 523(a)(4) claim on various emails introduced into evidence, claiming Debtors used Electric's funds for personal expenses unrelated to the business, such as building a new home and investing in some land, instead of paying ARS. At trial, ARS proved there was commingling of Electric's and Debtors' personal funds by pointing out various transfers back and forth between their respective accounts after Electric allegedly terminated its business on July 8, 2015. But, if Electric paid more to ARS during the time period of the Oklahoma Projects than it collected in total from those general contractors and more than three times what ARS billed Electric on the Oklahoma

37

Projects, then the Court is at a loss as to how funds from those contractors that were to be held in trust for ARS' benefit were instead inappropriately diverted.  In light of these facts, the Court cannot conclude that Debtors breached their fiduciary duties under the construction trust fund statute with respect to the Oklahoma Projects.

In conclusion, Section 523(a)(4) does not provide a basis for determining that any of Electric's Debt to ARS is nondischargeable.

## III.   SECTION 523(A)(6) DOES NOT PREVENT DISCHARGE OF DEBTORS' DEBT TO ARS.

Section 523(a)(6) generally relates to torts as opposed to contracts.  Lockerby v. Sierra, 535 F.3d 1038, 1040 (9th Cir. 2008).  It excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."  To prevail under Section 523(a)(6), a creditor must prove both a willful act and a malicious injury. Panalis v. Moore (In re Moore), 357 F.3d 1125, 1129 (10th Cir. 2004).  Thus, an intentional tort is required, and debts resulting from recklessness or negligence are not within the scope of Section 523(a)(6).  Barenberg, 2010 WL 3422584, at *6 (citing Kawaauhau v. Geiger, 523 U.S. 57, 64 (1998)).

The standard for a successful claim under Section 523(a)(6) is a stringent one and requires that the debtor's objectionable conduct must have caused "willful and malicious injury," i.e. "that the actor intend the *consequences* of an act, not simply the act itself."  Berrien v. Van Vuuren, 280 F. App'x 762, 766 (10th Cir. 2008) (citing Kawaauhau, 523 U.S. at 61-62)). Because "the debtor must desire to cause the consequences of his act or believe that the consequences are substantially certain to result from it,"  Berrien, 280 F. App'x at 766 (citing

Moore, 357 F.3d at 1129), a creditor must allege facts that support a reasonable inference that a debtor deliberately or intentionally caused injury to the creditor.  Barenberg, 2010 WL 3422584, at *6 (citing Kawaauhau, 523 U.S. at 61).  Generally, "an intentional breach of contract by itself is 'not the type of injury addressed by § 523(a)(6).'  To fall within § 523(a)(6), the breach must be willful and malicious."  Reperex, Inc. v. May (In re May), 579 B.R. 568, 593 (Bankr. D. Utah 2017) (citing Sierra Chems., LLC v. Mosley (In re Mosley), 501 B.R. 736, 744 (Bankr. D. N.M. 2013)); Tulsa Spine Hosp., LLC v. Tucker (In re Tucker), 346 B.R. 844, 854 (Bankr. E.D. Okla. 2006).

For its third cause of action under Section 523(a)(6) in its Second Amended Complaint, ARS alleges Debtors engaged in a course of conduct that misrepresented and foreclosed knowledge of Electric's true financial condition.  ARS asserts Debtors made false statements and assurances that Electric was solvent and would be able to pay its invoices "all while knowing that [Electric] was neither solvent nor would be able to pay the amounts owed [ARS] and with the knowledge that such conduct was certain to cause injury to [ARS]."  Second Amended Complaint at 6.  Such allegations do not suggest a claim under Section 523(a)(6), but instead one under Section 523(a)(2)(A) for false pretense, false representations, or actual fraud.  ARS did not, however, plead a claim under Section 523(a)(2)(A).[17]

In addressing Section 523(a)(6) in its Closing Argument, ARS again alleges false representations and additionally that Debtors effectively converted property that rightfully

---

[17]The Supreme Court recognizes that there can be overlap between the various claims raised under Section 523(a), and the same debt can be excepted from discharge under more than one subsection of Section 523(a).  Lenchner v. Korn (In re Korn), 567 B.R. 280, 316 (Bankr. E.D. Mich. 2017) (citing Husky Int'l Elects., Inc. v. Ritz, __ U.S. __, 136 S.Ct. 1581, 1588 (2016)).

belonged to ARS, notwithstanding any fiduciary duty owed.  It is true that conversion can, under certain circumstances, give rise to a nondischargeable debt pursuant to Section 523(a)(6).  Mitsubishi Motors Credit v. Longley, (In re Longley), 235 B.R. 651, 657 (10ᵗʰ Cir. BAP 1999).  But while Electric may have owed ARS money, it was never in possession of property belonging to ARS that it could be guilty of converting.  Any argument that payments Electric received from general contractors were actually ARS' property would necessarily hinge on ARS being the beneficiary of a construction fund trust under the Section 523(a)(4) claim discussed and rejected above.

The bottom line here is that Electric, via Debtors, simply did not pay its outstanding invoices to ARS.  Although nonpayment may be an intentional act by Debtors, ARS did not sufficiently prove that Debtors intended not to pay ARS, nor that they specifically intended to injure ARS.  First, Electric made numerous payments to ARS on a regular basis.  After Electric fell behind, it attempted a payment plan of $50,000 per week.  Although it did not actually pay ARS $50,000 per week, Electric did make payments to ARS totaling at least ***$130,000 per month*** during the months of January, February, March, April, May, and June of 2015.  Findings of Fact ¶ 40.  While they may have been less than what was owed, these substantial payments belie any assertion by ARS that Electric never intended to pay.  Andrews v. Chamblee (In re Chamblee), 510 B.R. 370, 386 (Bankr. N.D. Ala. 2014) (where debtor made payments and took other steps to be able to make payments, there was no proof that debtor never intended not to repay the debt); All Trades Temp. Serv., LLC v. Coates (In re Coates), 519 B.R. 842, 850-51 (Bankr. D. Utah 2014) (debtors "took steps that do not evince an intent to cause injury . . . but rather an intent to mitigate injury").

40

Second, there was no evidence that Electric or Debtors in fact had the money necessary to pay ARS' invoices, but chose not to pay or diverted the funds for inappropriate purposes (other than distributions to themselves on and after July 8, 2015, discussed above, that for the most part were subsequently repaid to Electric).  Simply put, Electric's lack of resources provides a non-malicious explanation for its failure to pay ARS' invoices.  See Al-Naji v. Al-Naji (In re Al-Naji), 521 B.R. 65, 70-71 (Bankr. W.D. N.Y. 2014).  Debtors made misrepresentations to ARS and/or Davis but there is absolutely no evidence (except as addressed below) that Debtors intended to harm ARS or bore any malice towards ARS.  From the Court's perspective, Debtors honestly believed the only way to pay their debts was to continue to work on their projects using ARS employees, receive payments from contractors and then pay their creditors, including ARS.  While the result to ARS, non-payment, seems unfair, it is a result that was neither desired nor substantially certain to occur until July 7–8, 2015.

The only facts that seriously suggest or support a willful and malicious intent to injure ARS for purposes of Section 523(a)(6) occurred on July 7 and 8, 2015.  Findings of Fact ¶¶ 47-50.  On July 7, 2015, Mrs. McDermott emailed Davis stating she was sending ARS a check for $50,000 and attached a copy of the check and the FedEx label with tracking information.  The $50,000 check was specifically an inducement to insure that ARS would have manpower back on the Cabela's job the following day, July 8, 2015.  Rather than receiving the $50,000 check the next day, Davis instead received another email from Mrs. McDermott.  The email of July 8, 2015, stated that Electric was forced to go out of business effective immediately and referred Davis to their counsel.  Moreover, on the same day Electric cancelled its $50,000 check to ARS, Electric issued a check in the same amount to Mrs. McDermott.  Mrs. McDermott testified that

41

Electric wrote and almost immediately stopped payment on the check to ARS on July 7, 2015, and then issued the check to her the next day "because we were scared." These facts arguably create at least an inference that Debtors intended to injure ARS. Debtors' request for ARS to put labor on the Cabela's job the next day and their decision for Electric to go out of business the very same day with over $1,000,000 owed to ARS is suspicious and difficult to overlook.

However, even if these facts rise to the level of willful and malicious injury on the part of Debtors, ARS did not put on any evidence as to the damages stemming from that specific injury. In the Court's view, the damages would have been the wages ARS had to pay for labor performed on the Cabela's job on July 8, 2015, labor it provided in reliance on the check that was promised by Electric but then canceled. ARS Exhibits 60 and 61 show two invoices on the Cabela's job issued on July 8, 2015, one for $13,406.30 and the other for $16,258.23. However, there is nothing that sets forth when the labor covered by the invoice was actually performed. Moreover, the last invoice from ARS to Electric on the Cabela's job was dated June 24, 2015, or two weeks earlier. Therefore, the July 8, 2015, invoices could be for labor performed any time during those two weeks. Additionally, Mr. McDermott testified he "shut that job down that day," i.e. he stopped work on Cabela's on July 8, 2015, and workers were sent home. Since ARS has not proven specific damages with respect to the limited willful and malicious injury by Electric, the Court cannot award any.

From all outside appearances, had Electric been well-managed, it had plenty of work that should have enabled it to pay ARS' invoices. But something was amiss – perhaps those in charge of Electric's financial operations were not able to accurately project job costs causing them to under bid projects, or maybe Electric was taking on more projects at one time than it

could reasonably expect to handle.  But whatever bad business practices or mismanagement caused Electric to be unprofitable, go out of business, and be unable to pay its invoices to ARS, that is not the type of conduct that nondischargeability on the basis of willful and malicious injury is intended to remedy.  Therefore, Section 523(a)(6) does not prevent Debtors' Debt to ARS from being discharged.

## CONCLUSION

The Court is not unsympathetic to ARS' plight of being left "holding the bag."  There is no dispute that Electric ceased operations owing ARS over $1,000,000.  But ARS' claims that the Debt is nondischargeable as to Electric's owners, Debtors, are simply not viable on the facts and evidence produced.  The Application submitted to ARS to initiate the open-account relationship was patently false as to Electric's approximate net annual income.  But Davis became familiar and involved with Electric's business and operations and continued to supply it with labor notwithstanding the ever-increasing delinquent invoices and evidence the Application was false.  Under those circumstances, continued reliance on the Application was not reasonable. With respect to its nondischargeability claim on the basis of fiduciary defalcation under the construction trust fund statutes, ARS did not prove that Debtors diverted trust funds for improper purposes.  Finally, ARS did not prove that Debtors willfully and maliciously injured it by not paying its invoices.  Therefore, the Debt to ARS is dischargeable.

IT IS SO ORDERED.

# # #